919 F.2d 384
 59 USLW 2329
 Joel R. GAFF, on behalf of himself, as a class action on
behalf of all others similarly situated, and as a
stockholder's derivative action for the
benefit of the corporation,
Plaintiff-Appellant,
Federal Deposit Insurance Corporation, in its corporate
capacity Intervening Plaintiff,
v.
FEDERAL DEPOSIT INSURANCE CORPORATION, Receiver of National
Bank & Trust Co. of Traverse City, a National Banking
Association, et al; David E. Pearce; Bruce W. Mann; and
other unknown defendants, Defendants-Appellees.
 No. 88-1566.
 United States Court of Appeals,
Sixth Circuit.
 Nov. 19, 1990.
 
 J. Bruce Donaldson (argued), Dykema, Gossett, Spencer, Goodnow & Trigg, Bloomfield Hills, Mich., Stuart D. Hubbell, Hubbell & Hubbell, Traverse City, Mich., for plaintiff-appellant.
 Stephen Novak (argued), Kenneth S. Schlesinger, Eric N. Macey, Novack & Macey, Chicago, Ill., Larry C. Willey, Grand Rapids, Mich., for Federal Deposit Ins. Corp.
 Richard A. Rossman, Pepper, Hamilton & Scheetz, Detroit, Mich., Mark W. Yonkman, Pepper, Hamilton & Scheetz, Philadelphia, Pa., Richard A. Wilhelm, Lawrence Campbell, Dickinson, Wright, Moon, Van Dusen & Freeman, Detroit, Mich., for defendants-appellees.
 Before MERRITT, Chief Judge, NELSON, Circuit Judge, and LIVELY, Senior Circuit Judge.
 MERRITT, Chief Judge.
 
 
 1
 The National Bank of Traverse City, a small national bank in Michigan with approximately $100 million in deposits, became insolvent due to alleged fraud and mismanagement. The Comptroller of the Currency declared the Bank insolvent and the Federal Deposit Insurance Corporation (FDIC) took over the Bank as receiver, pursuant to 12 U.S.C. Sec. 1821(c) (1988), amended by 12 U.S.C.A. Sec. 1821(c) (West 1989). The FDIC made approximately $47 million in payments from its insurance fund to cover potential losses to depositors, but did not liquidate the Bank. Instead, it chose to continue the Bank in operation by transferring the good assets and the deposit liabilities of the Bank to a solvent national bank under a "purchase and assumption agreement."[1]
 
 
 2
 As part of this agreement, the FDIC as receiver sold the Bank's questionable and nonperforming assets to itself in its corporate capacity. These included the insolvent bank's right to sue its former officers and directors for fraud and mismanagement, which the FDIC in its corporate capacity began to pursue. The FDIC has settled this case with the Bank's directors and officers liability insurer, contingent on the outcome of this case. Counsel have represented to us that the settlement almost completely depletes the available insurance fund.
 
 
 3
 The FDIC's lawsuit was not, however, the first attempt to assert claims for breach of fiduciary duty on behalf of the Bank. Shortly before it collapsed, Joel Gaff, a stockholder of the Bank, filed suit in Michigan court against the Bank's former officers and directors, asserting both derivative and direct actions under state law.[2] When the FDIC became the Bank's receiver, it intervened and moved to remove the case to federal court. Once there, the FDIC moved to dismiss Gaff's derivative claims because it was pursuing the Bank's rights against the officers and directors. The District Court denied this motion but stayed Gaff's derivative claims until the FDIC's claims were resolved. Gaff then amended his complaint to include claims under federal securities law and under the National Bank Act. The defendant officers and directors moved to dismiss these because Gaff had not alleged sufficiently distinct and personal injuries to maintain those causes of action. The District Court granted the motion, and also dismissed with prejudice Gaff's pendent state direct claims for breach of fiduciary duty. This Court affirmed all but the dismissal with prejudice of the state direct claims; we held with respect to these claims that the District Court should not have exercised pendent jurisdiction over them but instead should have remanded them to state court. Gaff v. FDIC, 814 F.2d 311 (6th Cir.1987) [hereinafter Gaff I ]. Upon reconsideration, this Court held that the District Court should have exercised its discretion to maintain jurisdiction over the pendent state claims and instructed it to proceed with adjudicating Gaff's direct action. Gaff v. FDIC, 828 F.2d 1145 (6th Cir.1987) [hereinafter Gaff II ].
 
 
 4
 This appeal involves the remaining claims that Gaff asserts against the officers and directors of the Bank, namely his direct, as opposed to derivative, actions. On the motion of the FDIC, the District Court on remand dismissed Gaff's direct claims because it held that Gaff had not alleged a sufficiently direct and personal injury under Michigan law to maintain a direct action. Gaff's injuries, according to the District Court, were injuries suffered by the corporation as a whole or all stockholders, not injuries suffered by Gaff and his class alone. Thus, Gaff's exclusive remedy is the recovery from the estate after the FDIC has compensated all creditors including itself.
 
 
 5
 There are two basic issues before the Court on appeal, one a conflict of laws question and the other a question of substantive banking law:
 
 
 6
 First, when the FDIC takes over an insolvent national bank, are legal issues concerning the ownership, priority, and adjustment of claims by stockholders against the Bank or its officers and directors governed by state law, or is local law preempted by a federal common law of uniform application?
 
 
 7
 Second, should the Court interpret the substantive banking law to bar the direct action by the former stockholders in this case (a) because the FDIC succeeds to all such claims upon its appointment as receiver; or (b) because the FDIC receives a priority in collecting losses suffered by the Bank?
 
 
 8
 We answer the first question in the affirmative, and therefore need not reach the issue of whether Gaff alleges sufficient facts to state a direct action under Michigan law. Indeed, we will assume without deciding that Gaff could allege sufficient facts to state a direct action. On the second question, we hold that, while the FDIC does not own the stockholders' choses in action against the officers and directors, it receives a priority over such actions when it is collecting losses from the officers and directors either in its capacity as receiver or on actions purchased from the receiver in its corporate capacity. Thus, even if Gaff could make out a direct claim--and we assume that he can--his action must await the completion, through litigation or settlement, of the FDIC's claims.
 
 
 9
 I. DOES FEDERAL COMMON LAW APPLY?
 
 
 10
 In determining whether to create a rule of federal common law, we must ask two questions. First, we must determine whether federal law applies. Second, we must decide whether a federal rule of law will displace state rules of commercial law. See United States v. Kimbell Foods, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979). The Supreme Court created three factors to aid lower courts in answering this second inquiry: whether the program needs national uniformity by its nature, whether the application of state law would frustrate the specific objectives of the federal program, and whether the application of a federal rule of common law would frustrate settled commercial practices predicated upon state law. To answer the initial question of whether federal law applies, we must analyze the relevant statutes and see whether federal law has preempted state law or not. We turn to that inquiry now.
 
 
 11
 Federal law traditionally applies in situations involving the federal bank insurance system. Shortly after Justice Brandeis's famous statement that "[t]here is no federal general common law," Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938), the Supreme Court held that the implications of a federal criminal law permitted the receiver of a failed national bank to collect on a promissory note even though the debtor and the bank had agreed that the note was a sham. Deitrick v. Greaney, 309 U.S. 190, 60 S.Ct. 480, 84 L.Ed. 694 (1940). The bank had illegally purchased some of its own stock, and the note was designed to hide that purchase in a legitimate-looking transaction. The Court found this rule in the policies underlying a criminal provision of the National Bank Act that forbade national banks from buying their own securities. Id. at 200-01, 60 S.Ct. at 485. Later, the Supreme Court extended and expanded the rule to say that a receiver of a failed bank could rely solely on the written records of the bank, and that parole or other evidence of different agreements would not defeat the receiver's interest. D'Oench, Duhme & Co. v. FDIC, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942). The Court found the source for this common law rule in the clear congressional policy of having a strong banking system, and it willingly deprived notemakers of potential state-law defenses that did not appear on the face of the putatively valid notes. Id. at 461-62, 62 S.Ct. at 681.
 
 
 12
 Congress later made the precise holding of D'Oench a statutory rule. 12 U.S.C. Sec. 1823(e) (1988), amended by 12 U.S.C.A. Sec. 1823(e) (West 1989); see also Platt & Darby, A Primer on the Special Rights and Immunities of the Federal Deposit Insurance Corporation, 11 Okla.City U.L.Rev. 683, 699-709 (1986) (distinguishing D'Oench doctrine and effect of Sec. 1823(e)). Nevertheless, the broader implications of D'Oench carry on to this day. Thus, in Clearfield Trust Co. v. United States, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943), the Supreme Court held that "[w]hen the United States disburses its funds or pays its debts, it is exercising a constitutional function or power," which cannot be limited by the operation of state law. Id. at 366, 63 S.Ct. at 574; see also National Metro. Bank v. United States, 323 U.S. 454, 65 S.Ct. 354, 89 L.Ed. 383 (1945) (under federal rule of law, negligence by government's own agents does not limit government's right to collect proceeds disbursed on forged check). This Circuit decided long ago that federal law governs disputes between a failed bank and its federal government insurer. Federal Sav. & Loan Ins. Corp. v. Third Nat'l Bank, 153 F.2d 678 (6th Cir.) (action by FSLIC against bank officers for conversion of bank funds arises under federal law and federal courts have jurisdiction), cert. denied, 329 U.S. 718, 67 S.Ct. 50, 91 L.Ed. 623 (1946).
 
 
 13
 In the context of the FDIC, courts have consistently applied federal law to this federal entity when it operates in its corporate capacity or liquidates a national bank. FDIC v. Leach, 772 F.2d 1262 (6th Cir.1985); FDIC v. Wood, 758 F.2d 156 (6th Cir.) (FDIC held to be a holder in due course, although source of power to make federal law not detailed), cert. denied, 474 U.S. 944, 106 S.Ct. 308, 88 L.Ed.2d 286 (1985); see also Trigo v. FDIC, 847 F.2d 1499, 1502 (11th Cir.1988) ("[F]ederal common law governs the rights and obligations of the FDIC when acting in its corporate capacity."); FDIC v. Gulf Life Ins. Co., 737 F.2d 1513 (11th Cir.1984); Gunter v. Hutcheson, 674 F.2d 862, 869 (11th Cir.) (FDIC in corporate capacity always governed by federal law whether statutory or otherwise), cert. denied, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982). Despite the fact that this suit involves the claims of stockholders against the officers and directors of a failed bank, it is clear to us that in this case, federal common law applies. Cf. Bank of Am. Nat'l Trust & Sav. Ass'n v. Parnell, 352 U.S. 29, 77 S.Ct. 119, 1 L.Ed.2d 93 (1956) (purely private law suit where federal government not a party but involving federal commercial paper does not require application of federal common law). Deciding the dispute between the stockholders and the officers and directors of the Bank necessitates determining the rights of the FDIC as receiver or as purchaser of the receiver's claims and possibly limiting its recovery. Cf. Stevens v. Lowder, 643 F.2d 1078 (5th Cir. Unit B 1981) (federal courts have jurisdiction over action between stockholders and purchaser of failed bank's assets because it is part of action to wind up affairs of a national bank).
 
 
 14
 Deciding that federal law applies only answers the first part of the federal common law inquiry. Under United States v. Kimbell Foods, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979), we must determine "whether this Court should fashion a uniform priority rule or incorporate state commercial law." Id. at 718, 99 S.Ct. at 1453. Kimbell Foods involved the priority of Small Business Administration (SBA) and Farmers Home Administration (FmHA) claims for loans in default. The Supreme Court decided that nondiscriminatory state laws should govern whether these government agencies had priorities over other creditors. In reaching this conclusion, the Supreme Court looked at three factors that helped expose the need for a uniform federal rule. First, the Court asked whether the federal program by its nature required a uniform federal rule or whether the program could survive under state law. Id. at 728, 99 S.Ct. at 1458. Second, the Court examined whether the "application of state law would frustrate specific objectives of the federal programs." Id. Finally, the Court considered "the extent to which application of a federal rule would disrupt commercial relationships predicated on state law." Id. at 729, 99 S.Ct. at 1459. After examining these three factors and how they applied to the Small Business Administration and the Farmers Home Administration, the Court decided that these federal loans would not receive a priority over other liens.
 
 
 15
 The national bank insurance system differs significantly from the loan programs under consideration in Kimbell Foods. First, the bank insurance system needs national uniformity by its nature. Unlike the SBA and the FmHA, the FDIC has not prepared itself for the application of state law to its transactions. See Kimbell Foods, 440 U.S. at 729-33, 99 S.Ct. at 1459-61 (both SBA and FmHA manual dictated use of state law in determining loan conditions); see also FDIC v. Bank of Boulder, 911 F.2d 1466, 1475 (10th Cir.1990) (en banc) (under federal common law, FDIC may acquire note not transferable under state law because of need for uniformity); FDIC v. Wood, 758 F.2d at 160-61 (under federal common law FDIC treated as holder in due course on allegedly usurious note acquired in purchase and assumption transaction because other result would frustrate federal program of insuring depositors). In addition, the FDIC must operate under severe time constraints when it closes a bank. Unlike the SBA and FmHA, which have time to structure their transactions, some FDIC bank closure transactions occur overnight. FDIC v. Gulf Life Ins. Co., 737 F.2d at 1517 (requiring FDIC to consider varying state law defenses of estoppel and unjust enrichment "would impede the FDIC's ability to select quickly between its liquidation and purchase and assumption alternatives"); Gunter v. Hutcheson, 674 F.2d at 869-70 (subjecting FDIC to state law would impair choice between purchase and assumption and other ways of handling bank failures).
 
 
 16
 Turning to the second part of the Kimbell Foods test, the national bank insurance program could not meet its objectives if subjected to state law. In Kimbell Foods, the Court compared the need for SBA and FmHA loans to have a priority to the federal tax lien statute. After examination, it concluded that "when the United States acts as a lender or guarantor, it does so voluntarily, with detailed knowledge of the borrower's financial status." Id. at 736, 99 S.Ct. at 1462. While the FDIC can decide who is covered by its insurance program, it cannot decide when it will serve as a receiver of a failed depository institution or for which bank. If appointed as receiver for a national bank, savings and loan, or state bank, the FDIC must accept the appointment. 12 U.S.C. Sec. 1821(c), (e) (1988). Congress made the FDIC the receiver in all cases because the FDIC had expertise in liquidating assets and it would structure all bank workouts to further best the interests of the national banking system. Without some form of priority or preference over stockholders in actions against former officers and directors of a failed bank, the FDIC could not achieve the policy objectives of a strong national banking system. See FDIC v. Bank of Boulder, 911 F.2d at 1476; FDIC v. Blue Rock Shopping Center, 766 F.2d 744, 748 (3d Cir.1985) ("[N]ational uniformity is important to permit the FDIC to promote the stability of and confidence in our nation's banking system."); FDIC v. Gulf Life Ins. Co., 737 F.2d at 1517 (impairing FDIC's ability to choose method of handling bank failure impedes federal program of national bank insurance); Gunter v. Hutcheson, 674 F.2d at 870; see also Golembe, The Deposit Insurance Legislation of 1933: An Examination of Its Antecedents and Its Purposes, 75 Pol.Sci.Q. 181 (1960) (national bank insurance designed to protect circulating medium and preserve existing banking structure).
 
 
 17
 The third and final Kimbell Foods factor--whether a federal rule would unnecessarily disrupt commercial expectations created by state law--also indicates that a federal rule of law should apply. The primary commercial expectations created by a national bank involve deposits taken and loans made, not the rights that stockholders might have against directors and officers in case of fraud or mismanagement. See FDIC v. Bank of Boulder, 911 F.2d at 1476 (commercial relationships disrupted at bank failure, and "it is doubtful that the eventuality of bank failure plays a significant role in the ordinary commercial expectations of the parties."); FDIC v. Blue Rock Shopping Center, 766 F.2d at 748 (where dispute involves ability of a co-maker to a note to raise defense of impairment of collateral against FDIC, "[t]here is no reason to believe that ... any of the parties predicated their behavior upon state law."); FDIC v. Wood, 758 F.2d at 161 (no difference to notemaker whether note transferred to holder in due course before or after bank's failure); Gunter v. Hutcheson, 674 F.2d at 872 ("[W]e doubt that the eventuality of a bank failure plays a significant role in the ordinary commercial expectations of the parties to negotiable instruments."). Direct actions against officers and directors are difficult to maintain in any event, so the rights that stockholders have do not rise to the level of "settled commercial practices" that necessitate application of state law to the FDIC's rights.
 
 
 18
 The Kimbell Foods analysis is not the only support for our conclusion that a federal rule of law applies to this case. Congress recently overhauled the national bank insurance system in the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101-73, 1989 U.S.Code Cong. & Admin.News (103 Stat.) 183 [hereinafter FIRRE Act]. This new statute reinforces our conclusion that federal law governs this case and that a federal rule of law is required to decide it. It is unnecessary to decide whether the statute's retroactive effect reaches this case. Cf. FDIC v. Jenkins, 888 F.2d 1537, 1538 n. 1 (11th Cir.1989). Even assuming that the new statute does not apply retroactively to this case, a doubtful assumption, we draw support from the policies behind the statute. See Deitrick v. Greaney, 309 U.S. 190, 60 S.Ct. 480, 84 L.Ed. 694 (1940) (finding federal common law in policies underlying criminal provisions in National Bank Act); NCNB Texas Nat'l Bank v. Cowden, 895 F.2d 1488, 1499-1500 (5th Cir.1990) (amendments in FIRRE Act to bridge bank law support conclusion that Congress intended to permit FDIC to transfer fiduciary responsibilities of failed banks); Jezarian v. Raichle (In re Stirling Homex Corp.), 579 F.2d 206 (2d Cir.1978) (relying on policies behind bill under consideration in Congress); see also G. Calabresi, A Common Law for the Age of Statutes 85-86 (1982) (discussing "gravitational pull" that statutes can work on common law development); Landis, Statutes and the Sources of Law, in Harvard Legal Essays 213 (1934) ("equity of statute" doctrine affects development of common law); Stone, The Common Law in the United States, 50 Harv.L.Rev. 4, 13-14 (1936) (suggesting that courts treat statutes more like judicial precedents); Traynor, Statutes Revolving in Common-Law Orbits, 17 Cath.U.L.Rev. 401 (detailing instances of using statutes as guide for common law).
 
 
 19
 In particular, three provisions of the new statute support the conclusion that federal law and a federal rule of law applies. First, section 212(a) vests in the FDIC "all rights, titles, powers, and privileges of the insured depository institution, and of any stockholder ... with respect to the institution and the assets of the institution...."[3] This suit involves the overall "assets of the institution." If the FDIC recovers more than it paid for the bad assets of a bank, the rest returns to the receiver who distributes it to the creditors and, eventually, the stockholders of the bank. Thus, any recovery by the FDIC reduces the overall outlay from the insurance fund, and thereby increases the possibility that the estate of the bank will have more money with which it can repay creditors and stockholders. The FDIC's right to recovery in these instances is determined under comprehensive federal law that preempts state law in this field.
 
 
 20
 The second provision in the new statute that indicates congressional intent to preempt state law is the new law concerning the FDIC's right of subrogation to the rights of depositors. The new law reads: "Notwithstanding any other provisions of Federal law, the law of any State, or the constitution of any State, the Corporation, upon the payment [of insurance proceeds] to any depositor ... shall be subrogated to all rights of the depositor against such institution or branch to the extent of such payment or assumption."[4] The old law did not contain the language preempting other federal and all state laws on the subject. 12 U.S.C. Sec. 1821(g) (1988). The law of subrogation also leads to our conclusion below that the FDIC obtains a priority over the direct actions of stockholders against officers and directors. We note it here merely to demonstrate Congress's intent to preempt state law by occupying the field of national bank insurance and the FDIC's rights.
 
 
 21
 Finally, Congress has clearly indicated that the liability of officers and directors of a bank are determined under federal law. The relevant language of the new statute reads:
 
 
 22
 A director or officer of an insured depository institution may be held personally liable for monetary damages in any civil action by ... the Corporation ... (1) acting as conservator or receiver of such institution, (2) acting based upon a ... cause of action ... conveyed by such receiver or conservator ... for gross negligence, including any similar conduct ... that demonstrates a greater disregard of a duty of care (than gross negligence) including intentional tortious conduct, as such terms are defined and determined under applicable State law.[5]
 
 
 23
 The legislative history of this provision explicitly states an intent to nationalize the law of directors' and officers' liability when banks are taken over by the FDIC.
 
 
 24
 Title II preempts State law with respect to claims brought by the FDIC in any capcity [sic] against officers or directors of an insured depository institution. The preemption allows the FDIC to pursue claims for gross negligence or any conduct that demonstrates a greater disregard of a duty of care, including intentional tortious conduct.
 
 
 25
 H.R.Conf.Rep. No. 222, 101st Cong., 1st Sess. 398 (1989), reprinted in 1989 U.S.Code Cong. & Admin.News 86, 432, 437. We read these provisions together to say that Congress referred to local law only for the definition of "gross negligence," not for the determination of the rights of FDIC to pursue such an action. Because a stockholder's direct action may interfere with the FDIC's pursuit of recovery, and because Congress intended that courts adjudicate that recovery under federal law, we must consider Gaff's claim under federal law as well.
 
 
 26
 Thus, the policies behind the national bank insurance system, as evaluated under the three criteria of Kimbell Foods and bolstered by sections of the FIRRE Act, lead to the application of federal law and the creation of an appropriate federal rule of law. We now turn to the substance of that rule.
 
 
 27
 II. THE SUBSTANTIVE RULE OF FEDERAL COMMON LAW
 
 
 28
 After the rejection of Swift v. Tyson, 41 U.S. (16 Pet.) 1, 10 L.Ed. 865 (1842), there has been no general federal commercial law. There is now developing special federal common law in a number of areas, as Congress nationalizes various areas of activity such as banking, labor relations, environmental protection, and pension plans. In acting as a common law court in this area, therefore, we must formulate a rule of banking law that fits appropriately in a corner of the common law garden without disrupting the landscaping.
 
 
 29
 The problem in this case, simply stated, involves the right of a corporation, through its receiver, to pursue actions against its officers and directors when the stockholders simultaneously sue under a theory of a direct action to recover against the same officers and directors. The receiver here is not just any receiver but an agency of the federal government charged with the important task of insuring bank deposits in order to guarantee the health of the nation's banking system. The rule in question must not only protect the interests of the parties but also support the general policy of a strong national banking system.
 
 
 30
 In examining this problem, two sources of law suggest that the FDIC should obtain a priority over Gaff's direct action: the law of corporate dissolutions and bankruptcy, and the new statute.A. The Law of Corporate Dissolutions and Bankruptcy
 
 
 31
 The problem in this case arises from the dissolution of a corporation. As a general rule of equity, stockholders take last in the estate of a bankrupt corporation. Because, unlike creditors and depositors, stockholders stand to gain a share of corporate profits, stockholders should take the primary risk of the enterprise failing.
 
 
 32
 This scheme of priorities is consistent with the economic theory of corporations. The corporate form is designed to protect the investor, and thus encourage investment in new firms. Under the rule of limited liability, for example, stockholders risk no more than the amount they invested, and tort victims generally cannot reach the stockholders' assets if the corporation's assets cannot cover the loss. In exchange for this kind of protection and for the chance that the enterprise will flourish and pay profits to them, the stockholders bear the risk that the enterprise will fail. Anyone who puts money into a corporation--in the case of a bank, the lenders and depositors--takes a small risk that the enterprise will fail. Because lenders and depositors do not have the chance of reaping profits should the corporation do well, corporate dissolution law shifts the risk of failure as much as possible to the stockholders. Stockholders make the riskiest investment in a firm: They have the risks of reward and of failure. Therefore, stockholders take last in the assets of the corporation upon its demise. See Easterbrook & Fischel, Limited Liability and the Corporation, 52 U.Chi.L.Rev. 89, 89-90, 98 (1985). This shift in priorities reflects stockholders' assumption of increased risk in exchange for the opportunity to reap increased profits, profits which a debt investor does not realize. See Slain & Kripke, The Interface Between Securities Regulation and Bankruptcy--Allocating the Risk of Illegal Securities Issuance Between Securityholders and the Issuer's Creditors, 48 N.Y.U.L.Rev. 261, 298 (1973).
 
 
 33
 To promote this policy of risk and reward, courts carefully scrutinize claims made by equity investors to prevent stockholder attempts to jump in the front of the queue. See, e.g., Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939); Taylor v. Standard Gas & Elec. Co., 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669 (1939) (the Deep Rock case). Although this case involves the assets of third parties associated with the Bank and not the assets of the Bank, the policy favoring putting stockholders last still applies. Assets of the officers and directors are not the assets of the corporation, but allowing stockholders to recover against the officers and directors first or on an equal basis with general creditors would create an inequitable preference in favor of the stockholders.
 
 
 34
 Our conclusion that the FDIC, as the designated statutory agent for marshalling and distributing the assets of the insolvent bank, should have a priority over the plaintiff stockholders in the recovery and the distribution of the proceeds of a stockholder's derivative action is analogous to the principle of equitable subordination in bankruptcy, as described in Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 669 (1939). There a stockholder, as a judgment creditor against his corporation, vied with the bankruptcy trustee for priority in the distribution of the corporate assets. The trustee argued that the creditors should come first despite the stockholder's levy on his judgment against the insolvent corporation. The question was "the priority which should be accorded it [the stockholder's judgment] in the distribution of the bankrupt estate" by the bankruptcy courts which the Court characterized as " 'essentially courts of equity and their proceedings inherently proceedings in equity.' " Id. at 304, 60 S.Ct. at 244 (quoting Local Loan Co. v. Hunt, 292 U.S. 234, 240, 54 S.Ct. 695, 697, 78 L.Ed. 1230 (1934)).
 
 
 35
 The Court then restated the guiding principles in the administration of insolvent corporations which are relevant for bank receiverships as well. First, the Court noted that even though it is "clear that breach of that fiduciary duty [of officers and directors of a corporation] may also give rise to direct actions by stockholders in their own rights," id. at 307 n. 15, 60 S.Ct. at 245 n. 15, the duty is enforceable in a stockholder's derivative action, and "is in the event of bankruptcy of the corporation, enforceable by the trustee. For that standard fiduciary obligation is designed for the protection of the entire community of interests in the corporation--creditors as well as stockholders." Id. at 307, 60 S.Ct. at 245 (footnote omitted). Second:
 
 
 36
 In the exercise of its equitable jurisdiction the bankruptcy court has the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankrupt estate. And its duty so to do is especially clear when the claim seeking allowance accrues to the benefit of an officer, director, or stockholder.
 
 
 37
 Id. at 307-08, 60 S.Ct. at 246 (footnote omitted). The Court then ordered that the claim of the stockholder should be subordinated to the claim of the trustee on behalf of creditors of the corporation under the doctrine of equitable subordination. Id. at 310, 60 S.Ct. at 246. The Court answered the question of priority in favor of the trustee.
 
 
 38
 The doctrine of equitable subordination in bankruptcy has been applied by federal courts many times since Pepper v. Litton and is now expressly recognized in Sec. 510(c) of the Bankruptcy Code.[6] In actions against officers, the degree of priority given to a direct action by creditors or stockholders over an action by the trustee turns on whether the officers' conduct injured the corporation more or an individual creditor or stockholder more. An automobile accident injury suffered by a stockholder at the hands of a corporate officer is not the same as the injury suffered when the officer embezzles corporate funds. If particular creditors or stockholders can show no injury unique or peculiar to themselves but one that affects creditors, stockholders and the corporation generally, then the corporation is given priority and the creditors' rights are subordinated. Thus, in Warren v. Manufacturers Nat'l Bank, 759 F.2d 542 (6th Cir.1985), this Court held that a creditor and sole stockholder of a bankrupt corporation could not sue a third party under RICO on the corporation's behalf because the corporation, not the stockholder, had suffered from the alleged acts of racketeering. This reasoning has been followed in other circuits. See, e.g., Delgado Oil Co. v. Torres, 785 F.2d 857 (10th Cir.1986) (creditor's suit against director for misrepresentations is part of estate because all creditors benefit from recovery under relevant state law); Mitchell ex rel. Mitchell Excavators v. Mitchell, 734 F.2d 129 (2d Cir.1984) (stockholders' derivative suit benefits corporation is thus part of bankrupt's estate); Rochelle v. Marine Midland Grace Trust Co., 535 F.2d 523 (9th Cir.1976) (trustee cannot assert securities claims on behalf of creditors because corporation suffered no injury from alleged violations of securities laws).
 
 
 39
 We recognize that the principles of equitable subordination do not apply to this case directly. This case is not in bankruptcy and the Bankruptcy Code does not govern bank failures. 11 U.S.C. Sec. 109(b)(2) (1988). Furthermore, the doctrine usually applies in circumstances more limited than those presented here. See Holt v. FDIC (In re CTS Truss, Inc.), 868 F.2d 146, 148-49 (5th Cir.1989); Benjamin v. Diamond (In re Mobile Steel Co.), 563 F.2d 692, 700 (5th Cir.1977) (three-part test for applying doctrine). Nevertheless, we draw two important lessons from the doctrine. First, the doctrine does not disallow the claim, but only subordinates it within the entire set of priorities. Herzog & Zweibel, The Equitable Subordination of Claims in Bankruptcy, 15 Vand.L.Rev. 83, 85-88 (1961). Second, the doctrine permits a court of equity to look at the overall fairness of a claim compared to others and to subordinate those claims with less fairness behind them.
 
 
 40
 In addition to equitable subordination, we also draw on the analogy offered by the treatment of rescission claims in the Bankruptcy Code. Before the adoption of the Code, investors who sued for rescission could recover at the same level of preference as other judgment creditors. After the adoption of the Code in 1978, all claims of investors are treated the same. 11 U.S.C. Sec. 510(b).[7] Congress adopted this provision to allocate the risk of business failure to stockholders and away from debt investors and to close a loophole that permitted stockholders to move up in line. See H.R.Rep. No. 595, 95th Cong., 2d Sess. 194-96, reprinted in 1978 U.S.Code Cong. & Admin.News 5787, 5963, 6154-67 (citing Slain & Kripke, The Interface Between Securities Regulation and Bankruptcy--Allocating the Risk of Illegal Securities Issuance Between Securityholders and the Issuer's Creditors, 48 N.Y.U.L.Rev. 261 (1973)). Like claims that are equitably subordinated, rescission claims are not disallowed. They are merely moved to the last set of priorities to reflect the risk and reward structure of corporations.
 
 
 41
 The Supreme Court recognized in Pepper v. Litton that stockholders may under some circumstances have a direct cause of action against corporate officers and directors. Such actions belong to the stockholders, not to the trustee. See Caplin v. Marine Midland Grace Trust Co, 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972); Williams v. California 1st Bank, 859 F.2d 664 (9th Cir.1988). Nevertheless, the policies underlying the national bank insurance system and the Bankruptcy Code permit us to create a priority for the FDIC and prevent a race to the courthouse between the FDIC and Gaff. The alleged wrongs of the officers in mismanaging the Bank hurt the Bank as a whole including its general creditors and depositors. The injury was not limited to the plaintiff stockholders, but also injured the "entire community of interests in the corporation." Any collection that the FDIC makes might eventually enure to the benefit of Gaff because it will enlarge the potential estate of the Bank. Moreover, if the officers and directors have money after the FDIC collects, then Gaff may proceed with his action. This position is consistent with the national policies expressed in the Bankruptcy Code of pro rata distribution, preventing a race to the courthouse, and putting stockholders last in distribution. Because this case must be decided under federal law, this national policy of priorities imported from bankruptcy law will be pursued, not state law policies that might be to the contrary.
 
 B. The New Banking Statute
 
 42
 Section 212 of the FIRRE Act, the new banking statute, establishes the "Conservatorship and Receivership Powers" of the FDIC. That section provides that notwithstanding any other provision of law, state or federal, the FDIC is subrogated to any claims of depositors, no matter whether the FDIC proceeds by way of liquidation or by way of a purchase and assumption agreement.[8]
 
 
 43
 Under the FIRRE Act, Congress expanded the subrogation rights of the FDIC. The amendment preempts all state law with regard to the FDIC's rights. Thus, when the FDIC sues the officers and directors, it sues not only on behalf of a bank but also the bank's depositors. This status also works in favor of establishing a priority. The depositors of an institution certainly have rights prior to those of the stockholders. Because the FDIC succeeds to the depositors' rights, it too should gain such a priority.
 
 
 44
 In addition, among other provisions, Congress decided to make commonly controlled institutions liable to the FDIC for losses incurred in assisting or liquidating one of the commonly controlled institutions. FIRRE Act, sec. 206(a)(7), Sec. 5(e), 12 U.S.C.A. Sec. 1815(e) (West 1989). This provision is not directly in point or controlling, but like bankruptcy law provides an analogous source of law helpful in formulating a federal common law principle to the question of priority presented by the instant case.
 
 
 45
 The statute defines the term "commonly controlled" at section 206(a)(7), Sec. 5(e)(9).[9] This new provision statutorily indemnifies the FDIC against loss with the funds of solvent parts of the same financial empire. Congress put the FDIC's claim for indemnity into a well-defined priority system.
 
 
 46
 The liability of any insured depository institution under this subsection shall have priority with respect to other obligations and liabilities as follows:
 
 
 47
 (i) SUPERIORITY.--The liability shall be superior to the following obligations and liabilities of the depository institution:
 
 
 48
 (I) Any obligation to shareholders arising as a result of their status as shareholders (including any depository institution holding company or any shareholder or creditor of such company).[10]
 
 
 49
 This places shareholders at the end of the line to recover from otherwise solvent third parties (e.g. the bank holding company).
 
 
 50
 The common control liability provisions do not stop with a priority system, however. They also create an ability to preclude other actions, like the stay in bankruptcy.
 
 
 51
 To the extent the exercise of any right or power of any person would impair the ability of any insured depository institution to perform such institution's obligations under this subsection--
 
 
 52
 (i) the obligations of such insured depository institution shall supersede such right or power; and
 
 
 53
 (ii) no court may give effect to such right or power with respect to such insured depository institution.
 
 
 54
 FIRRE Act, sec. 206(a)(7), Sec. 5(e)(4), 12 U.S.C.A. Sec. 1815(e)(4) (West 1989).
 
 
 55
 By no means does this statutory scheme decide the case before us. Because the Bank was not held in conjunction with any other financial institution, this case does not involve commonly controlled institutions. Nevertheless, the priority scheme established shows Congress's understanding of how priorities work in settings involving claims against solvent third parties when both the FDIC and stockholders assert claims. The equity of the statute supports our conclusion that the FDIC's claims against the Bank's officers and directors should receive a priority over Gaff's claim.
 
 
 56
 The legislative history of the FIRRE Act does show that Congress considered dealing specifically with the issue before us. The Senate considered a provision that would have granted the FDIC a priority similar to the one we create today. S. 774, 101st Cong., 1st Sess. Sec. 214(o)(1) (1989) read:
 
 
 57
 In any proceeding related to any claim acquired under section 11 or 13 of this Act against an insured financial institution's director, officer, employee, agent, attorney, accountant, appraiser, or any other party employed by or providing services to any insured financial institution, any suit, claim, or cause of action brought by the Corporation shall have priority over any such suit, claim, or cause of action asserted by depositors, creditors, or shareholders of the insured financial institution.... This priority shall apply to both the prosecution of any suit, claim, or cause of action, and to the execution of any subsequent judgments resulting from such suit.
 
 
 58
 It is unclear what happened to this provision as the FIRRE Act worked its way hastily through Congress. The Eleventh Circuit has interpreted the Senate's later failure to include this provision as a rejection of any priority for the FDIC in certain situations. FDIC v. Jenkins, 888 F.2d 1537, 1538 n. 1 (11th Cir.1989). While we distinguish the Jenkins case below, we also note that the legislative history says nothing about why the Senate did not include this proposal. We believe the best explanation is that Congress thought it best that the law of priorities in bank receiverships should be developed by the federal courts on a case-by-case basis.
 
 C. FDIC v. Jenkins
 
 59
 While this case was under consideration, the Eleventh Circuit in FDIC v. Jenkins, 888 F.2d 1537 (11th Cir.1989), rejected for a state-chartered bank a priority somewhat similar to the one we create today for a national bank. In that case, some stockholders of a state-chartered bank brought state and federal securities claims against the officers and directors of the bank. The FDIC succeded to the corporation's actions for mismanagement. The district court held that the FDIC had a priority over the assets of the officers and directors, and the Eleventh Circuit reversed.
 
 
 60
 We find, however, that Jenkins is not dispositive of our case. First, the stockholders in Jenkins asserted causes of action granted by statute, namely the state and federal securities laws. It is unclear from the opinion whether the stockholders claimed distinct fraud injuries peculiar to themselves or injuries which affected the corporation generally. The court makes no comparison between the injuries suffered by the plaintiffs in the two lawsuits in Jenkins. Like the stockholder who must seek the corporation's approval before filing a derivative action, we hold that a stockholder in this case must wait until the FDIC--either as the Bank's receiver or as the assignee of the receiver's claims--has collected its damages from defalcating officers before the stockholder can pursue his or her direct action. Second, the failed bank in Jenkins was a state-chartered bank, not a national bank. Thus, the policy reasons for applying federal law may differ somewhat in this case than in the Jenkins case.
 
 
 61
 In addition, we believe that the Eleventh Circuit may have weighed too lightly the policies behind the application of federal law to the FDIC. The court holds in Jenkins that it would not "approve of judicial expansion of the express powers and rights granted to the FDIC in the Act by Congress." 888 F.2d at 1541. This statement does not do justice to the large body of federal common law that accords the FDIC many rights that exceed the specific grants of power in the Federal Deposit Insurance Act and subsequent amendments. See, e.g., Gunter v. Hutcheson, 674 F.2d 862 (11th Cir.1982). These statements are dicta and the holding should not be read to reach the direct action before us.
 
 III. THE PRIORITY RULE
 
 62
 All of the various sources described above lead to one conclusion: In actions against the officers and directors of a defunct bank, the FDIC should receive a priority over the claims of stockholders. We establish this priority because of the general policy of allowing others to take from the estate of a dissolved corporation before stockholders and because of the national policy of protecting the banking system through the FDIC. This priority does not mean that the FDIC owns the stockholders' causes of action against the officers and directors. It only delays the direct actions pending against the officers and directors until the FDIC's case is fully litigated and settled.
 
 
 63
 The FDIC and the Bank's former insurer may have reached a final settlement in this case. That settlement hinges on the outcome of this litigation, and depletes almost all of the insurance fund. If that settlement becomes final--and we cannot tell from the settlement papers whether this decision satisfies the parties' agreement--then the stockholders will be free to pursue their actions against the officers and directors and seek any money that they have.
 
 
 64
 Once the FDIC's claims are satisfied, the stockholders' direct claims should then be considered under state law. After the federal interests of the FDIC are adjudicated, there are no remaining federal interests sufficiently strong to displace state law. Gaff's claims against the officers should then be adjudicated under state law. Because we establish a priority in favor of the FDIC, we have not had to reach the issue of whether Gaff has alleged a state cause of action. After the FDIC has completed its actions against the officers and directors, the District Court should lift its stay and refrain from exercising any further pendent jurisdiction over the action and remand it to state court for determination of the stockholders' direct claims under state law.
 
 IV. CONCLUSION
 
 65
 Accordingly, the judgment of the District Court is VACATED and the case is REMANDED to the District Court with the following instructions: The District Court should stay any proceedings on Gaff's claim until it has adjudicated the FDIC's claims or such claims have been settled. The District Court should then cease to exercise pendent jurisdiction of the state law actions and remand Gaff's claims to the state court for adjudication on the merits.
 
 
 
 [1]
 Whenever a bank fails, the FDIC has several choices on how to ensure that the insured depositors gain their money. The simplest is the straight payout. Under this plan, the FDIC simply seizes all of the bank's funds and begins writing checks to all depositors in the amount for which they were insured. In the meantime, all outstanding checks are returned unpaid, and the depositors' accounts are frozen until the FDIC can organize the failed bank's records. The FDIC can also establish a Deposit Insurance National Bank, also called a "bridge bank." A variation of the straight payoff, a Deposit Insurance National Bank is an entity of the FDIC that essentially operates in the failed bank's shoes. The FDIC has established few Deposit Insurance National Banks in its history. Under the straight payoff plan, the receiver loses all value that the failed bank may have had as a going concern; a Deposit Insurance National Bank might be able to preserve this value, but the estate of the failed bank would not realize this asset unless the FDIC sold the Deposit Insurance National Bank to another bank
 In contrast to the previous two strategies, the FDIC does not actually hand depositors their money under a purchase and assumption agreement. Instead, the FDIC, as receiver, after valuing the failed bank's assets, transfers the liabilities represented by insured and uninsured deposits to another bank, called the "assuming bank." The assuming bank agrees to pay out all of the deposits at full value. The assuming bank also purchases all of the good assets of the failed bank, including bank buildings and real property, fixtures, securities, credit card businesses, cash that the failed bank had on hand, and any good, working loans. These are called the "good assets." Included among the good assets is the going concern value of the failed bank, for which the assuming bank agrees to pay a premium. The "bad assets," by contrast, are nonpaying loans, judgments, and any choses in action that the failed bank might have against its officers and directors. In short, they are assets with high collection costs.
 The liabilities that the assuming bank assumes always exceed the good assets. Therefore, the FDIC must infuse money into the assuming bank so that it can cover its new depositors' funds. It does so with a purchase and assumption agreement. The FDIC in its corporate capacity pays the FDIC as receiver the difference between the value of the liabilities and the good assets, less the amount of the premium that the assuming bank agreed to pay; the FDIC as receiver then transfers this money to the assuming bank. The FDIC in its corporate capacity then purchases the bad assets from itself as receiver. The money that the receiver obtains for the bad assets goes into the failed bank's estate and is used to pay off the failed bank's remaining creditors, i.e. those other than depositors. In order to recoup the money it expended to effect the transfer, the FDIC in its corporate capacity then attempts to work the bad assets: It tracks down debtors who have long since defaulted, sells collateral, and sues on any choses in action that the failed bank had. I. Sprague, Bailout: An Insider's Account of Bank Failures and Rescues 222-27 (1986) (detailing FDIC's liquidating operation). Any recovery that exceeds the amount that the FDIC infused into the assuming bank, less some costs for interest and liquidation expenses, is returned to the estate of the failed bank for distribution to its creditors. For more complete descriptions of the FDIC's different ways of structuring a bank failure and the purchase and assumption agreement, see Gunter v. Hutcheson, 674 F.2d 862, 865-66 (11th Cir.), cert. denied, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982); Bransilver, Failing Banks: FDIC's Options and Constraints, 27 Admin.L.Rev. 327 (1975); Burgee, Purchase and Assumption Transactions Under the Federal Deposit Insurance Act, 14 Forum 1146, 1155, 1159 (1979).
 
 
 [2]
 Gaff styled his suit as a class action. The class has never been certified, but the certification issue is not before us
 
 
 [3]
 FIRRE Act, sec. 212(a), Sec. 11(d)(2)(A)(i), 12 U.S.C. Sec. 1821(d)(2)(A)(i) (West 1989) (emphasis added)
 
 
 [4]
 FIRRE Act, sec. 212(a), Sec. 11(g)(1), 12 U.S.C.A. Sec. 1821(g) (West 1989)
 
 
 [5]
 FIRRE Act, sec. 212(a), Sec. 11(k), 12 U.S.C.A. Sec. 1821(k) (West 1989)
 
 
 [6]
 [T]he court may--
 (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or
 (2) order that any lien securing such a subordinated claim be transferred to the estate.
 11 U.S.C. Sec. 510(c) (1988).
 
 
 [7]
 Section 510(b) currently reads:
 For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.
 
 
 [8]
 "Notwithstanding any other provisions of Federal law, the law of any State, or the constitution of any State, the Corporation, upon the payment [of insurance proceeds] to any depositor ... shall be subrogated to all rights of the depositor against such institution or branch to the extent of such payment or assumption." FIRRE Act, sec. 212(a), Sec. 11(g)(1), 12 U.S.C.A. Sec. 1821(g) (West 1989)
 
 
 [9]
 "For the purposes of this subsection, depository institutions are commonly controlled if--(A) such institutions are controlled by the same depository institution holding company ...; or (B) 1 depository institution is controlled by another depository institution." FIRRE Act, sec. 206(a)(7), Sec. 5(e)(9), 12 U.S.C. Sec. 1815(e)(9) (West 1989)
 
 
 [10]
 FIRRE Act, sec. 206(a)(7), Sec. 5(e)(2)(C), 12 U.S.C. Sec. 1815(e)(2)(C) (West 1989)